Filed 12/20/21  P. v. Oehring CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>　　　　Plaintiff and Respondent,<br><br>　　　　　　v.<br><br>CHARLES OEHRING,<br><br>　　　　Defendant and Appellant. | F079783<br><br>(Super. Ct. No. MF013059A)<br><br><br>**OPINION** |

APPEAL from a judgment of the Superior Court of Kern County.  Kenneth Green, Judge.

Nicholas Seymour, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra and Rob Bonta, Attorneys General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Daniel B. Bernstein, Michael A. Canzoneri, Keith P. Sager and Tia M. Coronado, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

**INTRODUCTION**

During a verbal altercation with his adult stepson, defendant Charles Oehring threatened two people who accompanied his stepson to finish moving out personal property. Sometime thereafter, his stepson's television was damaged. Defendant was later charged with one felony count of vandalism, in violation of Penal Code section 594, subdivision (b)(1),[1] and two felony counts of making criminal threats, in violation of section 422, subdivision (a). Following a jury trial, defendant was convicted as charged.

The trial court suspended imposition of sentence on counts 1 through 3 and placed defendant on probation for three years. In addition, the court imposed a restitution fine of $300 under section 1202.4, subdivision (b)(1); a probation revocation restitution fine of $300 under section 1202.44, suspended; a total court operations assessment of $120 under section 1465.8; and a total court facilities assessment of $90 under Government Code section 70373. The court ordered direct victim restitution to defendant's stepson in the amount of $5,499, and reserved jurisdiction over direct victim restitution to the victims of defendant's criminal threats. (§ 1202.4, subd. (f).) The court ordered defendant to complete anger management counseling at the direction of the probation department, and to complete 80 hours of community service.

On appeal, defendant claims the trial court erred in denying his request to instruct the jury on his right to eject trespassers from real property, pursuant to CALCRIM No. 3475. He also claims that the court erred in awarding his stepson $4,100 for the damaged television and, if we conclude the claim is forfeited, that trial counsel rendered ineffective assistance of counsel. Finally, in supplemental briefing, defendant requests remand so the court may reduce his probation term to two years pursuant to Assembly Bill No. 1950 (2019–2020 Reg. Sess.) (Assembly Bill No. 1950).

---

[1] All further statutory references are to the Penal Code unless otherwise stated.

2.

The People agree defendant is entitled to remand under Assembly Bill No. 1950, but otherwise dispute his entitlement to relief. They contend CALCRIM No. 3475 was not supported by substantial evidence, but any error in refusing to give the instruction was harmless. Further, they contend his challenge to the restitution order, to which the parties stipulated, was forfeited, trial counsel was not ineffective, and, on the merits, the court acted within its discretion in awarding $4,100 for the television.

We conclude that the trial court did not err in declining to give the requested jury instruction because it was not supported by substantial evidence, defendant forfeited his challenge to the direct victim restitution order, and trial counsel's stipulation to the restitution amount did not constitute ineffective assistance of counsel. We agree with the parties that defendant is entitled to relief under Assembly Bill No. 1950. However, remand is unnecessary in this case and, therefore, we shall reduce defendant's term of probation to two years on review. (§ 1260.) Except as modified, judgment is affirmed.

## FACTUAL SUMMARY[2]

Thomas G. is defendant's adult stepson. Thomas and his husband agreed to move back to California at the behest of Thomas's aging mother. In January 2018, they moved from out-of-state into the first-floor apartment of a guesthouse. Defendant's daughter, grandchildren and great-grandchildren lived on the second floor of the guesthouse, and Thomas's mother and defendant lived in the main house on the property. The arrangement was temporary until Thomas and his husband saved up money to move elsewhere, but they planned to pay rent.

Although the situation was cordial, there were unspecified tensions and Thomas and his husband moved out approximately one week later, on February 1, 2018. They moved most of their belongings to a storage unit, but some items were left behind, including a 75-inch television.

---

**2**      The defense rested without presenting evidence.

3.

In mid-July 2018, Thomas went to retrieve his remaining belongings after his mother texted him that he needed to come and get them. He told his mother he was still a little angry over a prior situation not described at trial and he did not think it was a good idea. Nevertheless, he asked the owner of the hair salon where he recently started working, Danielle B., if she could give him a hand and she agreed. Her six-year-old twin boys were at the salon that day, and after her husband, Denis B., arrived from his job, he also agreed to help.

There was some disagreement regarding how many cars they took to retrieve Thomas's belongings. Thomas testified that he, Danielle, and Denis drove three separate vehicles; Danielle testified she and Denis were together in the same vehicle; and Denis first testified he and Danielle were in the same vehicle before concluding he was unable to recall. Deputy Pierce, however, testified that Thomas was in one car while Danielle and Denis were in a white sport utility vehicle.

The group arrived at the property and parked by the guesthouse. Thomas's mother came to greet them, and the group chatted. Thomas's television was inside the apartment, undamaged, and the other items were outside on the patio. Thomas told his mother he would not be able to get the television until the weekend, but the group started moving some of the other items to the vehicles.

Defendant came out of the main house and went over to the guesthouse. Thomas testified defendant began yelling and asked why Thomas allowed his dogs to use the apartment as a "shit hole." Thomas, who had three cats and two dogs, told the jury he was unaware the dogs messed up the house and he thought he left the unit in good condition. However, during the time he was living in the apartment, he was training the dogs to use a pee pad and they missed sometimes. He acknowledged that after he moved out, his mother asked him if he was going to come back to clean up. When he later returned with a steam cleaner, the carpet had been ripped out.

4.

Thomas testified defendant called him a "fucking liar," and he responded, "'It is what it is. Let's move on.'" After a few more remarks were exchanged, some "nasty," defendant lunged at Thomas. Danielle stepped between defendant and Thomas to prevent them from fighting, which led to a verbal altercation between the defendant and Danielle. Denis then stepped in, defendant struck him in the face, and they grabbed each other's throats. Thomas's mother pushed defendant and Denis apart and told them to calm down.

Thomas testified that there was yelling, and obscenities and slurs were hurled. At some point, defendant called him a "'fucking fag[g]ot,'" and Thomas called defendant an "asshole" in response. Referring to Denis, who was from Guatemala, defendant told Danielle, "'Grab your spick and go,'" and "'[i]f you don't get off my property, I'm going to shoot you.'" Defendant also screamed at Danielle, "'I will shoot you, and the last thing you'll hear is your children crying your name.'" Danielle was yelling by then as well.

Denis told Thomas to gather what he could, and they would go. Thomas agreed, but defendant began yelling at Danielle and Denis again. They put the last few things in the car and Thomas told his mother they could not fit the television in because it was too large. As they were preparing to leave, Thomas asked defendant if he talked to his children, grandchildren, and great-grandchildren that way, and defendant "went nuts" and said anything left behind would not be there tomorrow. Defendant then grabbed a rock from the garden and ran into the downstairs apartment. Thomas heard glass breaking repeatedly and, "unglued," started to get out of his vehicle. Denis told him to "'[j]ust leave it alone,'" and they left the property.

Danielle's and Denis's testimony regarding the situation was materially similar to Thomas's account. Thomas was a new employee at Danielle's salon, and she and Denis agreed to help him pick up his remaining belongings. They had not met defendant

5.

before, and Danielle was unaware of any existing tension between defendant and Thomas. Prior to the altercation that day, Thomas also did not seem angry to her.

After they arrived, Danielle and Denis both saw Thomas's television inside the apartment, undamaged. Thomas's mother was present, she chatted with the group, and everything was fine until defendant showed up.

Danielle testified that defendant, who appeared angry, came from the main house, and began yelling at Thomas about the mess his cats made. The tense situation escalated when defendant began directing profanities at Thomas. Danielle testified that Thomas initially moved away and tried to avoid interacting with defendant, but they began arguing. Defendant called Thomas a "fucking fag," and Thomas called defendant an "asshole." Denis also heard defendant call Thomas "a fag[g]ot" and although he did not recall Thomas calling defendant a name in response, he described Thomas as angered by the slur.

Danielle testified that in an effort to keep peace, she stepped closer and said they were there just to get Thomas's stuff. As Denis walked up, defendant called Danielle "a spick-loving cunt." She then began to yell and as Denis tried to restore the peace, defendant hit him in the face. Danielle screamed and defendant said he was going to get a gun, shoot her and burn her "inbred" kids up, she would hear their screams as they died, and he would bury them in his backyard.

Danielle and Denis both testified that defendant said, "'get this mex off my property before I shoot him,'" referring to Denis. Defendant's behavior shocked and frightened Danielle, and Denis said they needed to go. At that point, their children were in the car hanging out of the open windows, and Thomas was very upset.

Denis testified that defendant punched him in the face as he was trying to gather Danielle and Thomas to go. Defendant was reaching around him to get at Thomas, however, so Denis was not sure if defendant intentionally hit him. Danielle was yelling and the situation was chaotic. Denis heard defendant call Danielle a "spick lover," and

6.

threaten to burn their car with the kids inside and bury it in the backyard. As defendant started back toward his front door, Denis ushered Danielle and Thomas to the vehicles. Denis was still standing outside the vehicle and Danielle was inside with her window rolled down. They both saw defendant pick up a palm-sized rock from the garden and run into the apartment. Both also heard the sound of glass breaking. Thomas started to go back toward the guesthouse, but Denis said if he could take a punch for Thomas, then Thomas could walk away. The group then left.

While driving, Thomas spotted a Kern County Sheriff's deputy parked along the road at a nature preserve and pulled off. Danielle and Denis pulled in after him. Thomas was agitated and told Deputy Pierce that defendant had broken his $4,100 television and hit one of his friends. Denis confirmed he was hit, but according to Deputy Pierce, no one reported being threatened and Denis did not want to press charges. Denis, however, testified he was told he would have to go back to the property to identify defendant and he did not feel comfortable doing so. Denis and Danielle testified they did not provide full statements to Deputy Pierce, but they later gave complete statements when a prosecutor and an investigator contacted them.

Approximately 15 to 20 minutes after Thomas first contacted him, Deputy Pierce arrived at defendant's property. Defendant was defiant and told Pierce that he and Thomas argued because Thomas owed him money for repairs to the apartment. Defendant said he had to rip out the carpet and use special chemicals on the floor to get the smell of animal feces and urine out. Deputy Pierce did not see any injuries on defendant, and defendant did not report he was injured, hit, or pushed.

Approximately 50 to 60 feet from the apartment, Deputy Pierce saw a patio table with broken glass, two patio chairs, and a large, damaged television by the trash cans.

# DISCUSSION

## I.      Instructional Error

### A.      Background

Defendant requested the jury be instructed on the right to eject trespassers from real property, pursuant to CALCRIM No. 3475, which provides:

> "The (owner/lawful occupant) of a (home/property) may request that a trespasser leave the (home/property). If the trespasser does not leave within a reasonable time and it would appear to a reasonable person that the trespasser poses a threat to (the (home/property)/ [or] the (owner/ [or] occupants), the (owner/lawful occupant) may use reasonable force to make the trespasser leave.

> "*Reasonable force* means the amount of force that a reasonable person in the same situation would believe is necessary to make the trespasser leave.

> "[If the trespasser resists, the (owner/lawful occupant) may increase the amount of force he or she uses in proportion to the force used by the trespasser and the threat the trespasser poses to the property.]

> "When deciding whether the defendant used reasonable force, consider all the circumstances as they were known to and appeared to the defendant and consider what a reasonable person in a similar situation with similar knowledge would have believed. If the defendant's beliefs were reasonable, the danger does not need to have actually existed.

> "The People have the burden of proving beyond a reasonable doubt that the defendant used more force than was reasonable. If the People have not met this burden, you must find the defendant not guilty of <insert crime>." (CALCRIM No. 3475.)

The trial court concluded that there was no evidence Danielle and Denis trespassed when they entered defendant's property and there was no evidence that once defendant ordered them to leave, they failed to do so within a reasonable time. Therefore, the trial court denied defendant's request for the jury instruction. On appeal, defendant claims this was error and by depriving him of a defense, the court violated his constitutional rights.

8.

## B. Legal Principles

"In criminal cases, even in the absence of a request, a trial court must instruct on general principles of law relevant to the issues raised by the evidence and necessary for the jury's understanding of the case." (*People v. Martinez* (2010) 47 Cal.4th 911, 953; accord, *People v. Mitchell* (2019) 7 Cal.5th 561, 586.) "[O]n request, a criminal defendant is entitled to pinpoint instructions that relate particular facts to an element of the charged offense and highlight or explain a theory of the defense if the instructions are supported by substantial evidence." (*People v. Nelson* (2016) 1 Cal.5th 513, 542; accord, *People v. Scully* (2021) 11 Cal.5th 542, 592; *People v. Ward* (2005) 36 Cal.4th 186, 214–215.) We review defendant's claim of instructional error de novo. (*People v. Scully, supra*, at p. 592; accord, *People v. Posey* (2004) 32 Cal.4th 193, 218.)

"The principles set forth in CALCRIM No. 3475 … apply primarily to cases in which the *owner or occupant* of property is charged with using excessive force to remove a trespasser," but may "also apply when there is an issue of whether a trespasser had any right to defend himself against the use of force by the owner/occupant of the property." (*People v. Johnson* (2009) 180 Cal.App.4th 702, 709.) Assuming the instruction applies in the context of criminal threats by a property owner, the trial court was not required to give it at defendant's request unless it was supported by substantial evidence. (*People v. Ward, supra*, 36 Cal.4th at pp. 214–215.)

In making this evaluation, "'the trial court does not determine the credibility of the defense evidence, but only whether "there was evidence which, if believed by the jury, was sufficient to raise a reasonable doubt …."'" (*People v. Mitchell, supra*, 7 Cal.5th at p. 583, quoting *People v. Salas* (2006) 37 Cal.4th 967, 982.) "'On appeal, we likewise ask only whether the requested instruction was supported by substantial evidence— evidence that, if believed by a rational jury, would have raised a reasonable doubt as to' an element of the crime in question." (*People v. Mitchell*, at p. 583, quoting *People v.*

*Mentch* (2008) 45 Cal.4th 274, 288.) However, "'unsupported theories should not be presented to the jury.'" (*People v. Marshall* (1997) 15 Cal.4th 1, 40.)

### C.      Analysis

In this case, the trial court found, first, that there was no evidence Danielle and Denis were trespassing. Second, treating defendant's first threat to get off his property or be shot as a request to leave, the court found no evidence that Danielle and Denis failed to go within a reasonable time. On these grounds, the court concluded the instruction was not supported by substantial evidence. Later, after the jury rendered its verdicts and defendant filed a motion for a new trial based on misdirection of the jury, the court again considered the instructional issue before denying the new trial motion.

Defendant now argues the court's refusal to instruct with CALCRIM No. 3475 was error because, one, his directive to Danielle and Denis to leave constituted substantial evidence that he thought they did not belong there. Two, he argues that his belief they were trespassing was reasonable given the absence of any evidence that he knew his wife invited Thomas to get his belongings or that her invitation included Danielle and Denis. He also argues that Thomas's testimony shows there was a delay between defendant's first statement to "'[g]rab your spick and go,'" and his subsequent threat to shoot if they did not leave. From this delay, he asserts a jury could conclude that a reasonable amount of time passed before defendant threatened Danielle and Denis.

As an initial matter, the instruction provides that if a trespasser who is asked to leave does not do so within a reasonable time *and* it appears to a reasonable person that the trespasser poses a threat, the owner may use reasonable force to eject a trespasser. There is no substantial evidence, however, that Danielle and Denis posed any threat to defendant.

Turning to defendant's argument, Danielle and Denis were not on defendant's property without consent, and the evidence does not support a reasonable inference that defendant thought they were. Rather, the evidence shows that Thomas's mother, who

10.

lived on the property with defendant, asked Thomas to retrieve his remaining belongings that day. When Thomas and his two helpers arrived to get his belongings, his mother greeted them, the group chatted, and things were calm. Tensions arose only after defendant arrived, and when he did, he did not question the presence of Thomas, Danielle, and Denis, or demand they leave. Rather, he started arguing with Thomas over pet damage to the apartment.

Defendant told Danielle and Denis to leave only after his argument with Thomas escalated, he hit Denis in the face, and Danielle began screaming at him. These facts simply do not support a reasonable inference that, prior to threatening Danielle and Denis, defendant thought they were trespassers. Rather, the uncontroverted evidence shows that defendant lost control of his temper and his own words of choice reflect racial animus rather than concern over any threat posed by a trespasser.[3]

Defendant bolsters his argument that Danielle and Denis failed to leave within a reasonable time with Thomas's testimony that "[t]here were a few other altercations" between the time defendant told Danielle to get off his property and his threat to shoot. The evidence does not allow for a precise second-by-second recounting of the events on the property, but even viewed in the light most favorable to defendant, the events transpired in a short amount of time. Thomas was referring to the brief verbal back and forth that occurred after defendant hit Denis, Danielle began screaming, and defendant told her to go. Nothing in the accounts by Thomas, Danielle, or Denis supports a reasonable inference that they delayed their departure beyond what was reasonable.

In sum, assuming without deciding that CALCRIM No. 3475 is applicable to criminal threats in violation of section 422, the trial court did not err in finding that the

---

[3]     The trial court declined to instruct the jury on self-defense and defendant does not challenge that ruling on appeal.

instruction was not supported by substantial evidence. Accordingly, we reject defendant's claim of error and need not consider the issue of prejudice.

## II. Restitution Order

### A. Background

Section 1202.4 provides, in relevant part,

"[I]n every case in which a victim has suffered economic loss as a result of the defendant's conduct, the court shall require that the defendant make restitution to the victim or victims in an amount established by court order, based on the amount of loss claimed by the victim or victims or any other showing to the court. If the amount of loss cannot be ascertained at the time of sentencing, the restitution order shall include a provision that the amount shall be determined at the direction of the court. The court shall order full restitution.… [¶] … [¶]

"(3) To the extent possible, the restitution order shall be prepared by the sentencing court, shall identify each victim and each loss to which it pertains, and shall be of a dollar amount that is sufficient to fully reimburse the victim or victims for every determined economic loss incurred as the result of the defendant's criminal conduct, including, but not limited to, all of the following:

"(A) Full or partial payment for the value of stolen or damaged property. The value of stolen or damaged property shall be the replacement cost of like property, or the actual cost of repairing the property when repair is possible." (§ 1202.4, subd. (f), *id.*, (3)(A).)

During trial, Thomas testified that just under two years prior to its loss, he paid $4,100, on sale, for his LG-brand television. Deputy Pierce testified that he and Thomas agreed the fair market value was $3,000. Thomas provided the same purchase price information to the probation department, supplemented by information that the make and model of his television was discontinued, it was extremely expensive to replace, and the cost for a Samsung-brand replacement was $5,996.99. During sentencing and with the parties' express agreement, the trial court awarded Thomas direct victim restitution in the amount of $5,499: $4,100 for the television, $1,000 for lost wages, $300 for mental health counseling, and $99 for the television wall mount.

Defendant now claims the trial court abused its discretion in awarding $4,100 for the television rather than the fair market value of $3,000. He argues that trial counsel did not expressly stipulate to the award of $4,100 and he is raising a purely legal claim, but if we conclude his claim is forfeited, trial counsel rendered ineffective assistance of counsel. The People, as defendant anticipated, argue he forfeited his claim by stipulating to the amount in the trial court, counsel was not ineffective, and, in any event, the trial court did not abuse its discretion in awarding $4,100 for the television.

### B.    Analysis

#### 1.    Forfeiture

Defendant's claim in this case does not implicate "'the "narrow exception" for "a so-called unauthorized sentence or a sentence entered in excess of jurisdiction"'"" (*People v. Martinez* (2017) 10 Cal.App.5th 686, 722), and, notwithstanding defendant's contrary position, the value of the television was an issue of fact for the trial court rather than one of pure law (*People v. Williams* (2017) 7 Cal.App.5th 644, 696). Defense counsel did not expressly speak to the $4,100 television value, but the prosecutor recited the items subject to restitution and their amounts, defense counsel submitted the issue, and both parties expressly stipulated to the total amount and to the absence of any need for a *Cervantes*[4] hearing. By failing to object and request a hearing on the matter, and instead entering a stipulation, defendant forfeited his appellate challenge to the restitution award. (§ 1202.4, subd. (f)(1); *People v. Holmberg* (2011) 195 Cal.App.4th 1310, 1319–1320.)

---

[4]    In *Cervantes*, this court held that a defendant is entitled to a hearing and judicial determination on victim restitution and ability to pay. (*People v. Cervantes* (1984) 154 Cal.App.3d 353, 361 (*Cervantes*); accord, *People v. DiMora* (1992) 10 Cal.App.4th 1545, 1549 ["If appellant is dissatisfied with the probation officer's determination, his remedy is to move for a hearing to dispute it."].) The right to a hearing to dispute restitution is codified in subdivision (f)(1) of section 1202.4.

## 2.    Ineffective Assistance of Counsel

Nor are we persuaded that defense counsel's failure to challenge the $4,100 award was ineffective. "'[A] defendant claiming a violation of the federal constitutional right to effective assistance of counsel must satisfy a two-pronged showing: that counsel's performance was deficient, and that the defendant was prejudiced, that is, there is a reasonable probability the outcome would have been different were it not for the deficient performance.'" *(People v. Woodruff* (2018) 5 Cal.5th 697, 736, quoting *People v. Alexande*r (2010) 49 Cal.4th 846, 888; accord, *Strickland v. Washington* (1984) 466 U.S. 668, 687; *People v. Mickel* (2016) 2 Cal.5th 181, 198.) To establish deficient performance, defendant must show that counsel's performance "fell below an objective standard of reasonableness under prevailing professional norms." (*People v. Mai* (2013) 57 Cal.4th 986, 1009; accord, *Strickland v. Washington, supra*, at pp. 687–688; *People v. Mickel, supra*, at p. 198.)

"On appeal, we do not second-guess trial counsel's reasonable tactical decisions." (*People v. Lucas* (2014) 60 Cal.4th 153, 278, disapproved on another ground in *People v. Romero and Self* (2015) 62 Cal.4th 1, 53–54, fn. 19.) "[A] defendant's burden [is] 'difficult to carry on direct appeal,' as a reviewing court will reverse a conviction based on ineffective assistance of counsel on direct appeal only if there is affirmative evidence that counsel had ""'no rational tactical purpose'"" for an action or omission." (*People v. Mickel, supra*, 2 Cal.5th at p. 198, quoting *People v. Lucas* (1995) 12 Cal.4th 415, 437.)

In addition to the $4,100 LG-brand television, $300 for counseling, and $99 for the television mount, the probation report recommended awarding $300 for the patio furniture set, $3,000 for six weeks of lost wages, and a replacement television of $5,996.99, for a total restitution award of $13,795.99. Based on a meeting with the defense, the prosecution agreed the second television in the amount of $5,996.99 and the patio set should be omitted, and lost wages should be reduced from six weeks to two weeks, resulting in restitution to Thomas in the amount of $5,499.

14.

The parties' conversations regarding restitution are not part of the record, but the record reflects they met and conferred. As well, the probation report reflects that the LG-brand television defendant damaged was no longer available and the replacement value for a Samsung-brand television was almost $2,000 more than the original LG television. Victims are entitled to "the replacement cost of like property …." (§ 1202.4, subd. (f)(3)(A).) While a victim is not entitled to "a windfall" (*People v. Thygesen* (1999) 69 Cal.App.4th 988, 995), as defendant argues, "[t]he goal of direct restitution is to restore the victim to 'the economic status quo'" (*People v. Sharpe* (2017) 10 Cal.App.5th 741, 746).

On these facts, defendant fails to show that trial counsel's stipulation to the restitution amount and failure to object to the $4,100 estimate for the television was ineffective. Counsel may well have determined that given the information in the probation report, any challenge to the award might either lead to a higher restitution amount or prove futile given that "'"[w]hen the probation report includes information on the amount of the victim's loss and a recommendation as to the amount of restitution, the defendant must come forward with contrary information to challenge that amount."'" (*People v. Holmberg, supra*, 195 Cal.App.4th at p. 1320.) Accordingly, on this record we find no error by trial counsel.

## III. Assembly Bill No. 1950

Finally, the parties agree that defendant is entitled to reduction of his probation term from three years to two years under Assembly Bill No. 1950 and that it is appropriate to remand the matter to allow the trial court to reduce the term.

"As amended by Assembly Bill No. 1950, subdivision (a) of section 1203.1 provides, 'The court, or judge thereof, in the order granting probation, may suspend the imposing or the execution of the sentence and may direct that the suspension may continue for a period of time *not exceeding two years*, and upon those terms and conditions as it shall determine. The court, or judge thereof, in the order granting

15.

probation and as a condition thereof, may imprison the defendant in a county jail for a period not exceeding the maximum time fixed by law in the case….'" (*People v. Schulz* (2021) 66 Cal.App.5th 887, 892.) In *People v. Schulz*, this court considered the issue of retroactivity and concluded that defendants are entitled to application of Assembly Bill No. 1950 in cases not yet final on appeal. (*Schulz, supra*, at p. 895.) Accordingly, we concur with the parties on that point.

As to the second point, the People contend remand would permit the trial court to adjust, modify, or strike any probation terms prior to the termination of probation. However, the probation order that is the subject of this appeal was entered on July 19, 2019, and Assembly Bill No. 1950 entitles defendant to a reduction of his probation term to no more than two years. Therefore, upon application of Assembly Bill No. 1950, defendant's probationary term has ended by operation of law.[5] (*People v. Chavez* (2018) 4 Cal.5th 771, 783 ["[S]ection 1203.3 provides for automatic discharge at the end of the probation term."].)

As the California Supreme Court explained:

> "Once probation ends, … a court's power is significantly attenuated. Its power to impose a sentence over the defendant ceases entirely—a result embodying the ideal that a court may not dangle the threat of punishment over a former probationer indefinitely. Such a possibility would raise both 'serious due process concerns' and fears of nullifying statutory provisions limiting the period of probation. (*People v. Leiva* (2013) 56 Cal.4th 498, 509, 517.) What is more, the court at that point may no longer revoke or modify its order granting probation. (§§ 1203.2, subd. (a) [specifying that the provision applies '[a]t any time during the period of supervision'], 1203.3, subd. (a) [providing that the court may exercise its authority 'at any time during the term of probation']; *In re Griffin* (1967) 67 Cal.2d 343, 346 (*Griffin*) [listing cases holding that, after the end of the probation period, '"the court loses jurisdiction or power to make an order revoking or modifying the order suspending the imposition of sentence or the execution

---

[5]     There is no indication that defendant's probation was revoked subsequent to this appeal, but later revocation proceedings and imposition of sentence would render defendant's present request for relief under Assembly Bill No. 1950 moot in any event.

thereof and admitting the defendant to probation"']; *In re Daoud* (1976) 16 Cal.3d 879, 882 ['A probation order may be revoked or modified only during the term of probation.']; *In re Bakke* (1986) 42 Cal.3d 84, 89 *(Bakke)* [same]; *People v. O'Donnell* (1918) 37 Cal.App. 192, 197 ['When, therefore, the legislature says, as it has said, that the order of suspension and probation may be revoked or modified *during the term of probation*, … the necessary implication is that it was the legislative intention not to confer upon the court the right to exercise that power after the time at which the period of probation has expired.'].) In particular, the court cannot extend the term of probation, change its conditions, or otherwise subject the defendant to punishment in lieu of the successfully completed probation. (*People v. Howard* (1997) 16 Cal.4th 1081, 1092 *(Howard)* ['Probation is neither "punishment" (see § 15) nor a criminal "judgment" (see § 1445).']; *People v. Mancebo* (2002) 27 Cal.4th 735, 754 ['probation is not punishment'].)" (*People v. Chavez, supra*, 4 Cal.5th at pp. 782–783.)

The People also contend the trial court can determine whether defendant met his conditions of probation for the purpose of expungement relief under section 1203.4, subdivision (a).[6] However, the length of defendant's probation term is a separate issue from his entitlement to an expungement under section 1203.4, subdivision (a). To the extent defendant elects to seek an expungement, the trial court will, at that time, determine whether he is entitled to the relief, including reviewing his compliance with his probationary terms. We need not remand where it would be an idle act and wasteful of judicial resources. (*People v. Ledbetter* (2014) 222 Cal.App.4th 896, 904.) Under the circumstances of this case, the parties fail to persuade us that remand is necessary or an

---

[6] Section 1203.4, subdivision (a)(1), provides, in relevant part: "In any case in which a defendant has fulfilled the conditions of probation for the entire period of probation, or has been discharged prior to the termination of the period of probation, or in any other case in which a court, in its discretion and the interests of justice, determines that a defendant should be granted the relief available under this section, the defendant shall, *at any time after the termination of the period of probation*, if he or she is not then serving a sentence for any offense, on probation for any offense, or charged with the commission of any offense, be permitted by the court to withdraw his or her plea of guilty or plea of nolo contendere and enter a plea of not guilty; or, if he or she has been convicted after a plea of not guilty, the court shall set aside the verdict of guilty; and, in either case, the court shall thereupon dismiss the accusations or information against the defendant and except as noted below, he or she shall thereafter be released from all penalties and disabilities resulting from the offense of which he or she has been convicted, except as provided in Section 13555 of the Vehicle Code.…" (Italics added.)

appropriate use of scarce judicial resources.  Therefore, under section 1260, we shall modify defendant's probation term to two years.  (Accord, *People v. Quinn* (2021) 59 Cal.App.5th 874, 885.)

## DISPOSITION

Pursuant to Assembly Bill No. 1950, defendant's term of probation is reduced from three years to two years.  The judgment is otherwise affirmed.


                                                  MEEHAN, J.

WE CONCUR:


LEVY, Acting P. J.


DeSANTOS, J.